**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**LYNN LONG**
**6503 GRAFTON STREET**
**FORESTVILLE, MD 20747**

                                **Plaintiff,**

                                             **Civil Action No.**

      **v.**

**THE ARCHITECT OF THE CAPITOL**
**c/o General Counsel**
**Ford House Office Building H2-265A**
**Second and D Streets SW**
**Washington, DC 20515**

                                **Defendant.**

_____

**COMPLAINT**

Plaintiff, Lynn Long is a Maintenance Mechanic at the Architect of the Capitol's Capitol Power Plant Jurisdiction.   Since the time that he was hired, in 2012, Mr. Long has been discriminated against because he was African American.  Mr. Long has been subjected to different working conditions than those of his white colleagues. He has been required to do "dirty jobs" and has been referred to as "lazy" and a "nigger."

The Architect has encouraged this racist behavior by, among other things, failing to take appropriate disciplinary action against employees who were found to have engaged in such conduct.  Most recently, Mr. Long was rejected for a promotion to be the Maintenance Mechanic Assistant Supervisor, in the fall of 2021.  Plaintiff asked for a meeting with his supervisors to discuss why he had not been selected, and that meeting took a threatening turn.  Plaintiff's supervisors intimated that they knew Mr. Long intended to take legal action, and they threatened that Mr. Long's evaluations would suffer told him he would have a better chance of career progression if he worked at another agency.

In this civil action, Plaintiff asserts claims for the denied promotion, a hostile work environment and retaliation.

## JURISDICTION

1. Plaintiff invokes the jurisdiction of this Court pursuant to the Congressional Accountability Act of 1995 (2 U.S.C. §1408 (a)), as well as 28 U.S.C. § 1331 (Federal Question).

2. This is an action authorized and instituted pursuant to the Congressional Accountability Act, as amended by the Reform Act of 2019 (2 U.S.C. § 1301 et seq.).

3. The unlawful employment practices alleged in this Complaint were committed in the District of Columbia.

4. Plaintiff is a current employee of the Architect of the Capitol; therefore, he is a "Covered Employee" under the Congressional Accountability Act, as amended (2 U.S.C. § 1301(3)(D)).

5. Defendant Architect of the Capitol (hereinafter "Architect" or "AOC") is an "Employing Office" covered by the Congressional Accountability Act (2 U.S.C. § 1301(9)(D)).

6. AOC is headquartered in the District of Columbia.

7. The Congressional Accountability Act, 2 U.S.C. § 1311(a)(1), mandates that "all personnel actions affecting covered employees shall be made free from any discrimination based on … race".

8. The Act also makes it unlawful for the USCP to "intimidate, take reprisal against, or otherwise discriminate against, any covered employee because the covered employee has opposed any practice made unlawful by [the] Act." 2 USC

9. Plaintiff has satisfied all administrative and judicial prerequisites to the institution of

this action. The Plaintiff filed a timely complaint at the Office of Congressional Workplace
Rights, which included all claims made in this civil action, on January 27, 2022.  Plaintiff files
this suit within the time limit defined by the Act (*i.e.*, within 70 days of filing his OCWR
complaint), and Plaintiff has not requested a hearing before the Office of Congressional
Workplace Rights.

## **FACTS**

10. Plaintiff began his employment at the Architect as a WG-12 Maintenance Mechanic
in 2012.  He remains in a WG-12 Mechanic position today.

11. Plaintiff's colleagues, Victor Shaw, Quinton Coleman, Dana Spencer, and David
Barletta, as a cohort, openly spoke poorly, and in racially charged terms, about Mr. Long and
another African American mechanic, Anthony Green.

12. Shaw, Coleman, Spencer, and Barletta referred to Plaintiff and other African
Americans as "niggers."

13. Shaw, Coleman, Spencer, and Barletta falsely claimed that Plaintiff and Mr. Green
worked more slowly than the other mechanics in the shop, that their work was of an inferior
quality than the other mechanics, and that the African American employees were "lazy."

14. Shaw, Coleman, Spencer, and Barletta caused problems for Mr. Long and Mr. Green
by falsely accusing them of wrongdoing at work.  For instance, on at least two instances in
January 2016 Barletta and Spencer falsely complained to higher managers, including Deputy
Plant Direct James O'Keefe that Mr. Long and the other mechanic had put soap in the coffee
maker.

15. On multiple occasions, Dana Spencer has bumped or knocked into Mr. Long while
passing him, and Spencer has loudly slammed objects as varied as rolls of duct tapes, doors, and

computers, near Plaintiff and the other African American mechanic in an effort to intimidate them.

16. On January 14, 2016, the Architect's Equal Employment Opportunity office (now known as the Diversity, Inclusion and Dispute Resolution office) conducted an environmental assessment of the Maintenance Mechanic shop, in which numerous instances of discriminatory behavior, including aggressive conduct toward black employees and preferential treatment toward white employees, were discussed.

17. The environmental assessment revealed that the Maintenance Mechanic shop was "split" into two camps – with one side aligned with (or supportive of) the black employees and another side that was antagonistic to the black employees.

18. Mr. Green complained about discriminatory harassment to which he and Plaintiff were being subjected to Mr. Korzeniewicz again in February 2016.

19. The Architect did not engage in any investigation and took no corrective action based on that complaint.

20. Rather than investigate the discriminatory environment, the Architect sent the shop to some sort of team-building meeting, at which each member of the shop was asked to express their feelings.  At that meeting, David Barletta exclaimed that Mr. Green was a "bad influence" on Plaintiff because he was outspoken and speaks up when his colleagues and supervisors mistreat him.

21. Plaintiff and Mr. Green were regularly required to perform jobs by themselves, whereas the white Maintenance Mechanics were always assigned to work in pairs.

22. In April 2017, Victor Shaw attempted to drive a wedge between the African American mechanics by telling Plaintiff that Mr. Green was a bad influence on him, only

because he was vocal in his defense against discriminatory treatment.

23. After Mr. Shaw left the Architect in 2018, Randy Charity, who had been the Assistant Supervisor, was promoted to the Supervisor position, leaving the Assistant Supervisor position vacant for approximately 12 months.  Mr. Charity is African American, but he has not taken steps to protect other individuals from discrimination.

24. After Mr. Coleman left the Architect (also in 2018), Dana Spencer was promoted to the Leader position.

25. As a Work Leader, Mr. Spencer was responsible for assigning specific tasks to the maintenance mechanics, monitoring their work performance and project completion, and advising the supervisor on how employees should be evaluated.

26. Mr. Spencer was the Acting Supervisor in Randy Charity's absence and on Mondays when Mr. Charity was off work for his Alternative Work Schedule day.

27. On or about May 8, 2019, another mechanic told Plaintiff that Mr. Spencer was threatening violence against Mr. Long (specifically, Spencer had threatened to "beat" Mr. Long's "ass.")

28. Mr. Long reported the threat to the shop Supervisor, Randy Charity, on May 8, 2019, and to the Maintenance Mechanic General Supervisor, or Foreman, James Burch on May 9, 2019.

29. On or about May 10, 2019, when Plaintiff's African American coworker, Mr. Green was assigned to inspect the ladders in the Power Plant, an assignment that Mr. Spencer would have been aware of, Mr. Green found a noose hanging from one of the ladders.

30. Mr. Green showed the noose to Supervisor Randy Charity, but – on information and belief – before photographs could be taken, someone untied the noose.

31. On information and belief, Mr. Spencer placed the noose where Mr. Green would find it as a warning to Plaintiff and Mr. Green against continuing to complain about discrimination.

32. On May 13, 2019, Mr. Long followed up with Supervisor, Randy Charity, to find out what was being done about Mr. Spencer's threat of violence.  Mr. Charity responded that no concrete actions were decided on.  Plaintiff informed Mr. Charity that he planned to file a complaint at the Office of Congressional Workplace Rights because of the Architect's inaction.

33. During a meeting on May 14, 2019, James Burch told Plaintiff that he had met with Mr. Spencer, but he declined to provide any additional information to Plaintiff.  As a result, Plaintiff informed Mr. Burch that he would speak to the Employee Relations Specialist who worked with the Capitol Power Plant jurisdiction, Brandi Mehok.

34. On May 15, 2019, Mr. Long spoke to Ms. Mehok about the situation, and she informed Plaintiff that an inquiry would be conducted by George Daniel.

35. Although Mr. Daniel was assigned to investigate Mr. Spencer's threat against Mr. Long, no one told Mr. Daniel about the noose that had been placed for Mr. Green to find. As a result, the noose incident was never investigated.

36. The Human Resources investigator interviewed Mr. Long on May 17, 2019, and Mr. Long confirmed that he was concerned about the discriminatory conduct and very concerned about retaliation from Dana Spencer.

37. The investigator issued management a report on May 29, 2019.  The written report confirms that Dana Spencer banged on the locker, called Plaintiff a "piece of shit" and told another mechanic that he intended to confront Mr. Long outside of work.

38. When Plaintiff followed up with George Daniel on June 3, 2019, Mr. Daniel told Plaintiff that the situation with Mr. Spencer was going to be handled "in house," and that he was

not able to go into any detail about the situation or the investigation.  Plaintiff responded that he was still very concerned about the environment and retaliation.  Mr. George apologized, telling Plaintiff that there was nothing more that he could do.

39. On information and belief, no disciplinary action was taken against Mr. Spencer because of his conduct.

40. On or around June 5, 2019 a white maintenance mechanic told Plaintiff that, for years, Mr. Spencer had regularly referred to Plaintiff, Mr. Green and Randy Charity as "niggers."

41. On June 6, 2019 Mr. Green again reported Mr. Spencer's racist conduct to Randy Charity and James Burch (Maintenance Mechanic Foreman).

42. On June 14, 2019, Aaron Redmond (Assistant Engineering Director, James Burch's supervisor) had direct confirmation from a disinterested witness who stated that Mr. Spencer had used racial slurs toward the African Americans in the shop on multiple occasions.

43. Following Mr. Green's and Plaintiff's complaints, Mr. Spencer assigned Mr. Long to work by himself on the roof of the power plant for three straight days on one of the hottest stretches of the summer.

44. The Architect retained an outside investigator, which investigated the Maintenance Shop and issued a report in July 2019.

45. The Outside investigator interviewed Mr. Long on or about June 28, 2019, and Mr. Long also provided a written statement about Mr. Spencer's past intimidating and racist conduct.

46. The outside investigator interviewed Jim Burch and Aaron Redmond.

47. Mr. Burch told the investigator that he doubted the black employees' complaints and suspected that they were colluding with each other to fabricate a legal claim.

48. Mr. Redmond stated that although Spencer had previously admitted that he had

threatened Long with violence, he doubted the allegation that Spencer was using racial slurs until

it was confirmed by another employee (who was white).

49. Mr. Spencer remains employed as a Work Leader at the Architect of the Capitol to

this day.

50. In November 2019, Mr. Green filed suit against the Architect of the Capitol, alleging

a hostile work environment based on race.

51. In early 2020, Mr. Green made several additional complaints about racially

discriminatory conduct by the new Assistant Supervisor, Jason Fuentes.

52. Among other things, Mr. Fuentes singled the other black mechanic out for dirty and

difficult jobs that the mechanic was instructed to perform alone, and – on one occasion – called

the U.S. Capitol Police on the black mechanic, falsely accusing the mechanic of threatening

conduct.

53. No disciplinary action was taken against Mr. Fuentes, and instead Aaron Redmond

encouraged and endorsed Mr. Fuentes' conduct.

54. With the outset of the COVID pandemic, the Architect implemented work schedule

changes that interrupted the hostile conduct toward Plaintiff.

55. At some point in time following the onset of the COVID-19 pandemic, Mr. Fuentes

vacated the Assistant Supervisor position and transferred to another jurisdiction within the

Architect of the Capitol.

56. Mr. Green named Lynn Long as a witness for him in his lawsuit, during discovery.

Specifically, Mr. Green identified Plaintiff as a witness in his initial disclosures on September

24, 2020. And Mr. Green named Plaintiff a witness to the facts of the hostile work environment

as well as to his emotional pain and suffering damages in his interrogatory responses, which

were served on or about October 14, 2021.

57. For the duration of Mr. Green's litigation, the Architect of the Capitol concluded that Mr. Long would act as a supporting witness to Mr. Green's complaint.

58. In June 2021, the Architect advertised a vacancy announcement for the Assistant Supervisor position that Jason Fuentes had vacated, under announcement No. CPP-2021-176.

59. Mr. Long was exceptionally well qualified for the Assistant Supervisor position.

60. First, as of the time of the selection, Mr. Long had approximately 9 years of experience working in the Capitol Power Plant as a Maintenance Mechanic. That experience was key, because the Capitol Power Plant is a unique environment, due to its age and the peculiar equipment and systems in the Capitol Power Plant.

61. Second, Mr. Long has numerous certifications that make him extremely qualified to supervise the work of the Maintenance Mechanic shop. Among other certificates from the National Association of Power Engineers, Mr. Long has his Air Conditioning Mechanic – 3 certification (the highest level of certification), his High and Low Pressure Systems Certificates (of particular importance because the CPP generates steam to heat the Capitol complex), and his Electric Motors and Electric Controls, Certificates.

62. Third, in recent years, Mr. Long has been the point person for all major projects performed by the Maintenance Mechanic Shop.

63. Except for 2020 (when no one received an Outstanding and everyone was given Meets Expectations ratings), Mr. Long has regularly been rated as "Outstanding" for his performance. In 2020, due to the COVID pandemic work adjustments, no Outstanding evaluations were issued for the maintenance mechanics.

64. Mr. Long applied for the position before the July 2, 2021 deadline, supplying all

required documents and illustrating that he was highly qualified for the position.

65. Mr. Long was deemed qualified and interviewed for the position on September 1, 2021.

66. The interview panel consisted of Bernard Warnowicz, why by that time had replaced James Burch as the Maintenance Mechanic General Supervisor), Randy Charity (Maintenance Mechanic Supervisor), and Thomas Cangemi (Safety and Occupational Health Manager).

67. Meanwhile, in Mr. Green's civil action (in which Lynn Long had been named as a witness), a settlement in principle was reached in the summer of 2021, and it was memorialized into an agreement to be signed by the parties on October 20, 2021.

68. In late October 2021, Mr. Long learned that he was not selected for the position.

69. Defendant continued the selection process, on information and belief, by interviewing candidates who were not considered "highly qualified" based on their application materials.

70. In late October or early November 2021, Mr. Long asked for an informational interview from the interview panel to explain why he was not selected.  At the time of the interview, no selection had been made, and interviews were proceeding.

71. The responses from the panel were incoherent and indicative of both discrimination and retaliation.

72. Mr. Redmond, who was not on the interview panel, but who presumably had final selecting authority, claimed that the "shadow" of a prior incident was an issue for him.  This was particularly unjustified and glaring, because the incident in question involved a situation approximately four years earlier, when – after returning to work after a bad broken leg incident, and during which Mr. Long was on light duty because of his incomplete recovery and the need to take pain medication during the day, which made him drowsy – Mr. Redmond found Mr. Long

dozing off while at work.  No corrective action was taken about this incident because Mr. Long's supervisors were aware of the situation and knew that had to take medication during the day as part of his medical treatment.  This shows, however, that Mr. Long never stood a chance at promotion in Mr. Redmond's eyes and for no legitimate reason.

73. Mr. Charity stated that the panel was looking for someone with experience working at other power plants. This made no sense because the Capitol Power Plant is a unique environment with unique equipment, so experience at other power plants is not germane.

74. Mr. Warnowicz suggested that Mr. Long was not selected because of alleged work ethic issues, such as not showing up for work on time, taking long breaks, not being found at the job site, and talking on the phone. He then contradicted himself by admitting that he was not asserting that Mr. Long exhibited any work ethic issues.  Mr. Warnowicz also suggested that Mr. Long might have better luck being promoted at a different agency.

75. Aaron Redmond stated that Mr. Long was not selected because he may not have performed well on certain tasks or projects, although Mr. Redmond did not offer any specifics. In response, Mr. Long stated that he regularly received "Outstanding" performance evaluations – to which Mr. Redmond responded, in an intimidating fashion, that Mr. Long should not be receiving those "Outstanding" evaluations.

76. Mr. Warnowicz comment that Mr. Long might have better luck achieving a management position at another agency was an indication that there was no place for Mr. Long to advance in the Capitol Power Plant, a comment that smacks of a discriminatory attitude considering Mr. Long's qualifications and history of outstanding performance.

77. Mr. Redmond's statement that Mr. Long should not have received Outstanding evaluations in the past was a threat of retaliation if Mr. Long took his disagreement over the non-

selection further.

78. One of the panelists closed the meeting, making a reference that he expected Mr. Long to lodge a complaint about the non-selection. That statement shows that the supervisors who met with Plaintiff, Aaron Redmond (Assistant Engineering Director), Bernard Warnowicz (Maintenance Mechanic General Supervisor), and Randy Charity (Maintenance Mechanic Supervisor), interpreted Mr. Long's request for a meeting as an indication that he intended to lodge a complaint about the non-selection on the grounds that it was discriminatory (race) or retaliatory.

79. Plaintiff's meeting with his supervisors was extremely humiliating. Statements made in the meeting were consistent and directly in-line with demeaning and discriminatory comments that had been made by Dana Spencer, and others, falsely referring to Plaintiff as lazy, with a bad work ethic and poor work quality.

80. Plaintiff's meeting with his supervisors was also extremely intimidating, particularly having one high-level supervisor tell him that his employment prospects would be better if he left the Architect of the Capitol (Warnowicz) and having another (Redmond) threaten that Plaintiff should not be receiving "Outstanding" Performance Evaluations.

81. Ultimately, Defendant selected another internal candidate, who was not black, who had not engaged in protected activity, and who had far less relevant experience than Mr. Long in the unique systems and equipment found at the Capitol Power Plant.

82. Since the time that Mr. Long asked for the meeting to discuss his non-selection, Mr. Long's work has been repeatedly sabotaged. On at least two occasions, including December 17, 2021 and December 23, 2021, someone has come after Mr. Long and damaged the pump that Mr. Long was performing work on. The damage was so extensive on December 17, 2021 that

Mr. Long had to disassemble and rebuild the pump.

83. The sabotage to Mr. Long's work was extremely intimidating because it placed Mr. Long in potential physical harm and demonstrates that Defendant's employees or supervisors are willing to go to extreme measures to either disadvantage Mr. Long because of his race (by making his work appear defective) or to intimidate Mr. Long into ceasing his protected activity.

84. Mr. Long contends that, taken in consideration with the history of intimidating conduct from Mr. Spencer, as well as Spencer's use of racial slurs, the non-selection in September 2021, the threatening comments from supervisors during the post-selection interview, and the sabotage to Mr. Long's work constitutes a hostile work environment against Mr. Long based on his race and/or prior protected activity.

## COUNT I: NON-SELECTION BECAUSE OF DISCRIMINATION BASED ON RACE

85. Plaintiff repeats and reavers each of the foregoing paragraphs as if they were specifically restated here.

86. Defendant violated the Congressional Accountability Act because it rejected Plaintiff for the position of Assistant Supervisor because he is African American.

87. Plaintiff was eligible and well qualified for the position of Assistant Supervisor.

88. Plaintiff timely applied for the position and submitted all required documentation to demonstrate his eligibility.

89. Plaintiff was removed from consideration for the position due to discriminatory animus toward African Americans, and the ultimate selectee was not African American.

90. As a result of Defendant's unlawful conduct, Plaintiff has suffered economic harm in the form of lost income associated with the Assistant Supervisor position.

91. As a result of Defendant's unlawful conduct, Plaintiff has suffered emotional pain

and suffering, stress, fear, embarrassment, and humiliation.

### COUNT II: NON-SELECTION BECAUSE OF RETALIATION

92. Plaintiff repeats and reavers each of the foregoing paragraphs as if they were specifically restated here.

93. Defendant violated the Congressional Accountability Act because it rejected Plaintiff for the position of Assistant Supervisor because he engaged in protected activity under the Congressional Accountability Act.

94. Mr. Long opposed discrimination by complaining about discrimination and participating and giving statements about discrimination in 2016, as well as on May 8 and 9, 2019 (when he complained about Mr. Spencer's discriminatory and intimidating conduct), on June 28, 2019, and when he provided written statement to the outside investigator who investigated the hostile work environment in the shop.

95. Mr. Long also engaged in protected activity by acting as a witness for Anthony Green during Mr. Green's litigation against the Architect of the Capitol, which concluded in November 2021.

96. Plaintiff was eligible and well qualified for the position of Assistant Supervisor.

97. Plaintiff timely applied for the position and submitted all required documentation to demonstrate his eligibility.

98. Plaintiff was removed from consideration for the position due to retaliatory animus toward him.

99. As a result of Defendant's unlawful conduct, Plaintiff has suffered economic harm in the form of lost income associated with the Assistant Supervisor position.

100.    As a result of Defendant's unlawful conduct, Plaintiff has suffered emotional pain

and suffering, stress, fear, embarrassment, and humiliation.

## COUNT III: DISCRETE ACTS OF RETALIATION

101.   Plaintiff repeats and reavers each of the foregoing paragraphs as if they were specifically restated here.

102.   Plaintiff repeatedly engaged in protected activity under the Congressional Accountability Act (as amended), including on May 8 and 9, 2019 when Mr. Long complained to Mr. Charity and Mr. Burch about Mr. Spencer's threat of violence, on June 28, 2019 when he gave a statement confirming Mr. Spencer's discriminatory conduct, and over the course of the Anthony Green litigation, in which Mr. Long was named as a witness who would support Mr. Green's claims of discrimination.

103.   As discussed in paragraphs 71-78 (incorporated by reference here), Plaintiff's supervisors engaged in materially adverse conduct (meaning that it "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006) (internal citations omitted)) toward him when they threatened that he should not be receiving Outstanding evaluations, accused him of questionable work practices and ethics, and suggested that Plaintiff's employment prospects would be better if he left the Architect of the Capitol and worked at another agency.

104.   On information and belief, the sabotage to Plaintiff's work, in December 2021, was conducted by someone in Plaintiff's chain of command, or someone working at the behest of one of Plaintiff's supervisors.

105.   The sabotage to Plaintiff's work, in December 2021, was intended to intimidate Plaintiff, to stop him from engaging in any additional protected activity.

106.   The sabotage to Plaintiff's work in December 2021 was "materially adverse" in

that it was intimidating and placed Mr. Long in fear of disciplinary conduct, negative performance reviews and future promotions (as directly stated by the supervisor during the post-interview meeting discussed in Paragraph 71-78, above), such that it "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006) (internal citations omitted).

107. As a result of Defendant's unlawful conduct, Plaintiff has suffered emotional pain and suffering, stress, fear, embarrassment, and humiliation, to the point that he fears for his job and believes he may be forced to leave his employment with the Architect.

## COUNT IV: HOSTILE WORK ENVIRONMENT BASED ON RACE AND RETALIATION

108. Plaintiff repeats and reavers each of the foregoing paragraphs as if they were specifically restated here.

109. Plaintiff is African American.

110. Plaintiff repeatedly engaged in protected activity under the Congressional Accountability Act (as amended), including on May 8 and 9, 2019 when Mr. Long complained to Mr. Charity and Mr. Burch about Mr. Spencer's threat of violence, on June 28, 2019 when he gave a statement confirming Mr. Spencer's discriminatory conduct, and over the course of the Anthony Green litigation, in which Mr. Long was named as a witness who would support Mr. Green's claims of discrimination.

111. Taken in consideration with the history of demeaning and intimidating conduct from Mr. Spencer, and others, including the use of racial slurs, the non-selection in September 2021, the threatening and demeaning comments from supervisors during the post-selection interview, and the sabotage to Mr. Long's work, was part of a hostile work environment against Mr. Long based on his race and/or prior protected activity.

112.     The Architect failed to take prompt action to address the discrimination and harassment against Mr. Long when it learned about the conduct through Mr. Long's own complaints and the investigations that the AOC conducted.

113.     As a result of the Architect's failure to act, the Architect endorsed the hostile conduct and encouraged it to continue under different supervisors and employees, as explained above.

114.     The hostile conduct described herein at the hands of Plaintiff's supervisors and AOC management followed (at least in part) Plaintiff's protected activity, and it was "materially adverse" in that it "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006) (internal citations omitted).

115.     The hostile work environment alleged herein was additionally severe and/or pervasive enough to alter the terms and conditions of Plaintiff's employment, and it was targeted at Plaintiff because of his race (African American) and/or his protected activity.

116.     As a result of the AOCs unlawful conduct, Plaintiff has suffered emotional pain and suffering, stress, fear, embarrassment, humiliation, inconvenience, feelings of depression and anxiety and fear of losing his job.

WHEREFORE, Plaintiff prays that this Court: (i) declare that the employment practices complained of in this Complaint are unlawful in that they violate the Congressional Accountability Act; (ii) permanently enjoin the Defendant and its agents, officers and employees from engaging in all practices found by this Court to be in violation of the Congressional Accountability Act; (iii) order the Defendant to make the Plaintiff whole by placing him in the

Assistant Supervisor position, with backpay to the date the Architect selected another candidate, paying Plaintiff his monetary damages and his compensatory damages in an amount to be determined at trial; (iv) retain jurisdiction over this action to ensure full compliance with the Court's orders and require the Defendant to file such reports as the Court deems necessary to evaluate such compliance; (v) order the Defendant to pay Plaintiff's costs and expenses and reasonable attorneys' fees in connection with this action; and (vi) grant such other and further relief to the Plaintiff as the Court deems just and proper.

**PLAINTIFF DEMANDS A TRIAL BY JURY**

Respectfully Submitted,
ALDERMAN, DEVORSETZ & HORA, PLLC

Leslie D. Alderman III (D.C. # 477750)
1025 Connecticut Ave., NW
Suite 615
Washington, DC 20036
Tel: 202-969-8220
Fax: 202-969-8224
lalderman@adhlawfirm.com

Attorney for the Plaintiff, Lynn Long